Judson v. Walker.

JUDSON, Appellant, v. WALKER et al., Appellants; HAX et al., Appellants v. WALKER et al., Appellants; FIRST NATIONAL BANK v. WALKER et al., Appellants; SCHUSTER-HAX NATIONAL BANK v. WALKER et al., Appellants; SPENCER v. WALKER et al., Appellants.

### Division One, March 14, 1900.

1. **Insolvency:** HARD TIMES: DEBTS GREATER THAN ASSETS. Where one's assets were in the market worth much less than his liabilities, and he paid his debts as they fell due out of the money by him borrowed and not out of his assets, he was insolvent, although the market value of the assets may have been due to general distressful financial conditions, and although he was to all appearances doing a successful business.

2. **Minors and Curators as Defendants:** INSURANCE MONEY. In a suit to subject to the payment of the debts of the insured the proceeds of insurance policies, at first issued to the insured for the benefit of his estate, and afterwards assigned by him to his wife and minor children, the suit can not be brought against the curator of the minors, but must be brought against them directly. The title to an infant's estate is in the infant and not in the curator.

3 **Insolvency:** ASSIGNMENT OF LIFE INSURANCE. An assignment of life insurance policies to wife and children by an insolvent debtor, is not deemed fraudulent as to creditors and is not void in law unless the premiums in any year out of his funds or property exceed $500. And in this case the surrender cash value of the poli-

Judson v. Walker.

cies at the time of the assignment, less $500, and interest on the balance, is the amount that the deceased husband's creditors may recover for the payment of his debts, and not the amount of all the premiums paid less $500 multiplied by the number of years insured paid them.

4. ———: ———: AMOUNT OF CREDITOR'S CLAIM. The husband took out two life insurance policies in an old line company, amounting to $25,000, for the benefit of himself and his estate, and paid premiums on them for a number of years, and in January 1894, becoming insolvent, assigned them to his wife and children and died in August, 1895. The annual premiums on the two policies amounted to $937.50, and the cash surrender value at the time of the assignment was $2083.33 (in which is included a premium for $263 which had been paid only a month previously). *Held*, that from this cash value is to be taken $500, and the balance of $1,583.33, with six per cent interest, is the amount which the creditors of the deceased husband are entitled to have subjected to the payment of their debts.

5. **Several Plaintiffs:** DISTRIBUTION OF EQUITABLE FUND. Where resort must be had to an equity court to subject funds to the payment of debts, they become equitable, and are to be distributed among the creditors, not in the order in which they filed their suits, but *pro rata* among all the plaintiffs in such suits.

Appeal from Buchanan Circuit Court.—*Hon. Thomas ·H. Parrish*, Judge.

REVERSED AND REMANDED (*with directions*).

*Johnson, Rusk & Stringfellow* for appellants, Judson and Hax.

(1) The children had nothing to do with these policies or their proceeds. Baker v. Young, 47 Mo. 453; Reed v. Painter, 129 Mo. 674. Defendant Woodson had a part of the money and was claiming the right to hold it as curator, and Annie Walker had received a part of it and was claiming the right to it; on this account in order to settle these claims, they were made defendants. (2). J. W. Walker being dead and an administrator having no power to impeach a convey·

ance made by the deceased, a court of equity is the proper forum. 5 Ency. Pl. & Pr., 428, 429; George v. Williamson, 26 Mo. 190; Zoll v. Soper, 75 Mo. 460; Jackman v. Robinson, 64 Mo. 289; Central Natl. Bank v. Hume, 128 U. S. 195; Woehner Am. Law of Admr., sec. 296. It is a matter not of ancillary but of original jurisdiction in courts of equity. Kendall v. Creighton, 64 U. S. 90. (3) A voluntary conveyance made by an insolvent debtor is void as to pre-existing debts. Gamble v. Johnson, 9 Mo. 605; Snell v. Harrison, 104 Mo. 158; Snyder v. Free, 114 Mo. 360. Defendants practically concede this and claim protection under certain statutes of this State. The statutes relied on by them are sections 5851 and 5854, R. S. 1889. These statutes do not apply to these policies. They are enabling acts and should not be extended to cases not coming strictly within their terms. Charter Oak Life Ins. Co. v. Brant, 47 Mo. 419. None of the policies in question comes within the terms of section 5851, for none of them was taken out by Mrs. Walker either "in her own name or the name of a third person," and none of them is "for her sole use." Reed v. Painter, 129 Mo. 679. And furthermore the premiums are above the amount limited. Charter Oak Life Ins. Co. v. Brant, 47 Mo. 419; Stone v. Knickerbocker Life Ins. Co., 52 Ala. 518; Bliss on Life Ins. sec. 322; Merchts. & Miners Trans. Co. v. Borland, 31 Atl. Rep. 272. (4) A policy taken out in fraud of creditors may be reached by them just as may policies fraudulently assigned. Merchants & Miners Trans. Co. v. Borland, 31 Atl. Rep. 272. Where the statutes do not apply, fraudulent assignments of insurance policies are governed by the general laws touching fraudulent conveyances and may be set aside upon the same grounds as may other fraudulent conveyances. Pullis v. Robinson, 73 Mo. 201; Central Bank v. Hume, 128 U. S. 195; Barnes v. Vetterlien, 16 Fed. Rep. 218; Appeal of Elliott's Executors, 50 Pa. St. 75; Stokes v. Coffey, 8 Bush

(Ky.) 533; Merchants & Miners Transp. Co. v. Borland, 31 Atl. Rep. 272; Fearn v. Ward, 80 Ala. 555; Anthracite Ins. Co. v. Sears, 109 Mass. 383.   (5)   We further contend that not the premiums alone, nor the cash surrender value only, nor a part of the proceeds, but the whole thereof can be followed by the creditors.   Taylor v. Coern, 1 Ch. D. 636; Pullis v. Robison, 73 Mo. 201.

*Frank Hagerman, Thos. J. Porter* and *B. R. Vineyard* for appellants, Mary V. Walker, Annie Walker and Stephen C. Woodson.

(1)   To reach the interests of the minor children, of whose estates the defendant, Stephen C. Woodson, was curator, the proceedings should have been against them personally.   They were necessary parties, and the objection of Woodson to the introduction of any evidence as against him should have been sustained.   Gregory v. Stetson, 133 U. S. 586; Speakman v. Tatum, 45 N. J. Eq. 390; Butler v. Lawson, 72 Mo. 246.   The grantee in a fraudulent conveyance is a necessary party defendant in a suit to set it aside. Jackman v. Robinson, 64 Mo. 289; Dillon v. Bates, 39 Mo. 292; Lilly v. Menke, 126 Mo. 190.   (2)   The curator could not in any way have entered the appearance of the minors, nor bound them or their interests by any act on his part. Gibson v. Chouteau, 39 Mo. 565; Railroad v. Campbell, 62 Mo. 585; Fisher v. Seekmann, 125 Mo. 165.   (3)   The insurance companies were not made parties to the suits, though in fact parties to the contracts on which the money had been paid.   The court had no power to set aside the transfers of the policies without the companies being before the court. Besides, if any fraud had been perpretrated on the creditors by the transfers, its purpose had been accomplished, and the money was then in the hands of the fraudulent donees.   In such case the remedy of the creditor, if he has any, for any

part of the money paid, is by an action at law, the same as would be the garnishment of a fraudulent holder of personal property. Egerman v. Krieckhaus, 7 Mo. App. 456; Lackland v. Garresche, 56 Mo. 550; Humphreys v. Atlantic Co., 98 Mo. 550; Epstein v. Clothing Co., 67 Mo. App. 226; Gotcher v. Haefner, 107 Mo. 270. (4) And in such action at law each party should be sued alone for the money received by him or her. There should be no effort, as in this case, to hold the children liable for any part of the $10,000 collected exclusively by the mother from the Equitable Life Assurance Society. And in such action, either party would have the right to trial by jury, and no question could arise as to whether there should be a *pro rata* distribution among the creditors. The action would be one in assumpsit for money had and received. Magoffin v. Muldron, 12 Mo. 512; Clark v. Bank, 57 Mo. App. 285; Winningham v. Fancher, 52 Mo App. 458. (5) If we concede the method adopted to be correct, in arriving at the proper measure of damages, when suit is brought for the recovery of premiums fraudulently paid, we deny the right of a court to follow it, where the pleadings are framed as in these cases. The plaintiffs appealing simply seek to set aside the assignments—not to recover for any part of the premiums paid. Such creditor can not recover the insurance money when paid. Kieley v. Hickcox, 70 Mo. App. 617; Thompson v. Cundiff, 11 Bush. 573; Forrester v. Gill, 53 Pac. Rep. 230; Pence v. Makepeace, 65 Ind. 485; State ex rel. v. Tomlison, 45 N. E. Rep. 1116; Wanschaff v. Ins. Co., 41 Mo. App. 206; Reed v. Painter, 129 Mo. 674. (6) Section 5854 of our statutes is in the nature of an exemption law, and like all statutes of that kind, and in fact like all laws for the preservation and support of the family is to be construed liberally so as to effectuate the benign spirit and purpose of the law. Wanschaff v. Ins. Co., 41 Mo. App. 206; Charter Oak Ins. Co. v. Grant, 47 Mo. 419; Stone v. Knickerbocker, 52 Ala. 589;

Johnson v. Alexander, 125 Ind. 575; Emmerson v. Gould, 99 Mass. 155; Thompson v. Cundiff, 11 Bush. 573; Cole v. Marple, 98 Ill. 58; Elliott v. Bryan, 64 Md. 368; Earnshaw v. Stewart, 64 Md. 513; Gale v. McLaurens, 66 Miss. 461. It is accordingly held, that the proceeds of policies, so written as not to fall within the express provisions of the statute, are yet protected against the claims of creditors, on the ground that they are within the spirit of the law.    Felrath v. Schonfield, 76 Ala. 199; Cole v. Marple, 98 Ill. 58; Succession of A Constant Hearing, 26 La. 326; Thompson v. Cundiff, 11 Bush. 573; In re McKinney, 15 Fed. Rep. 535. (7)  A man, though insolvent, has a right, independent of statute, to make reasonable provision by securing life insurance for the benefit of his wife and children, who are dependent on him.    His duty to his family in making provision for their maintenance, within reasonable limits, is just as high and binding as that to his creditor if not more so; and the State and society are equally concerned with himself in the rearing of his children, and in the support of them and his widow after his demise.    It is for these reasons, that the general rule, which makes voluntary conveyances by an insolvent debtor presumably fraudulent and voidable as to creditors, can have no application to such cases as we are now considering.    Stone v. Knickerbocker, 52 Ala. 589; Johnson v. Alexander, 125 Ind. 575; Pence v. Makepeace, 65 Ind. 345; State v. Tomlinson, 45 N. E. Rep. 1116; Cole v. Marple, 98 Ill. 58; Central Bank v. Hume, 128 U. S. 195; McCutcheon's Appeal, 99 Pa. St. 133; Weber v. Paxton, 48 Ohio St. 266; Warner v. Kosh, 4 Ill. App. 501; Emmerson v. Gould, 99 Mass. 155; Succession of A Constant Hearing, 26 La. 326; 2 Beach on Ins., sec. 1147; 2 Bigelow on Frauds, 129.    And the assignment of a policy by the insured to his wife and children is tantamount to taking out a new policy in their names and for their benefit.    Cole v. Marple, 98 Ill.

58; Thompson v. Cundiff, 11 Bush. 573; Succession of A. Constant Hearing, 26 La. 326.

*Ben J. Woodson* and *Willard P. Hall* for respondent, the First National Bank.

(1) The actions were necessarily in equity. There was no remedy at law. The theory upon which the suits were brought was that the assignments of the policies in January, 1894, by J. W. Walker to his wife and children were fraudulent as to his then creditors, for the reason that at that time he was in embarrassed financial condition, and the assignments were purely voluntary. (a) A general creditor has no such interest in the property of his debtor as to enable him to follow the proceeds thereof in the hands of a fraudulent grantee in an action at law. Such a creditor may seize the property while still in the fraudulent grantee's hands as the property of the debtor, but he can not sue the fraudulent grantee for its value. He has no claim at law, against the fraudulent grantee. His remedy at law is limited strictly to the property itself. Adler v. Fenton, 24 How. 407; 1 Bigelow on Fraud, pp. 7, 69; vol. 2, pp. 427, 428; Westfall v. Powell, 45 Pac. Rep. 92; Aspinwall v. Jones, 17 Mo. 209; Wait on Fraud. Conv., sec. 62; Lamb v. Stone, 11 Pick. 527; Bump on Fraud. Conv. (4 Ed.), secs. 475, 623; Lawrence v. Bank, 35 N. Y. 320. (b) The statute on fraudulent conveyances does not apply to such a case; it operates only upon the property conveyed by the debtor, and not upon that which the grantee may receive in exchange therefor. The latter can not be reached by legal process, execution or attachment. Bump on Fraud. Conv., (4 Ed.), sec. 475; Richards v. Ewing, 11 Hump. 327; Childs v. Yerger, 1 Yerg. 80. (2) The debtor, Mr. James Walker, was dead. The rule is universal that all the assets of a deceased debtor constituted a trust fund for the benefit of his creditors, which they can have administered. Borer v.

Chapman, 119 U. S. 587; McClintock's App., 29 Pa. St. 361; 5 Am. and Eng. Ency. of Law, 307; 2 Perry on Trusts, secs. 558-560; Leakey v. Maupin, 10 Mo. 368; Morris v. Mowatt, 2 Paige 586; Hagan v. Walker, 14 How. 32. (a) The debtor being dead, no legal process could issue against his property. No execution can issue after defendant's death on a judgment obtained prior thereto. Swearingen v. Adm'r, 7 Mo. 422; Brown v. Woody, 64 Mo. 551; Miller v. Doan, 19 Mo. 650; Hardin v. McCause, 53 Mo. 261; R. S. 1889, sec. 4921; Gunby v. Brown, 86 Mo. 257; Brown v. Woody, 98 Mo. 260; Brown v. Woody, 22 Mo. App. 253. (b) The lien of a judgment obtained during defendant's life is destroyed by his death. Swearingen v. Adm'r, 7 Mo. 422; Prewitt v. Jewell, 9 Mo. 732; Harrison v. Renfro, 13 Mo. 446; Miller v. Doan, 19 Mo. 650; R. S. 1889, sec. 6024. (3) The minor children of James W. Walker were not necessary parties. Besides which, any objection on the ground that they were not made parties defendant comes too late. It has been waived. (a) In case of a fraudulent assignment it is not necessary to make parties the creditors whose debts are provided for in the conveyance. Garver v. Wakeman, 11 Wend. 187; Irwin v. Keen, 3 Whart. 347; McKinley v. Combs, 1 Mon. 105; Thersson v. Hickok, 37 Vt. 454; Scudder v. Vorhies, 5 Sandf. 271; Bank v. Suydan, 6 How. Pr. 397; Russell v. Lasher, 4 Barb. 232; Rogers v. Rogers, 3 Paige, 379. (b) The same rule prevails in cases of fraudulent deeds of trust. The beneficiary is not a necessary party. Tucker v. Zimmerman, 61 Ga. 599. (c) It has been frequently decided by this court that a defect of parties will be deemed waived unless the objection is raised in one of the ways stated. Scott-Force Hat Co. v. Hombs, 127 Mo. 399; Loan & Trust Co. v. Brown, 59 Mo. App. 466; Lencke v. Treadway, 45 Mo. App. 517; Franke v. St. Louis, 110 Mo. 521; Merchants Bank v. Gilpin, 105 Mo. 17. (4) Aside from all statutory provisions on

the subject, an insolvent husband can not lawfully transfer by way of gift a policy on his own life, payable to himself or legal representatives, which has a surrender value. Such a transfer would be a fraudulent conveyance and void as against creditors. In any and every policy of insurance on his life taken out by an insolvent debtor, payable to himself or his estate, his creditors have such an interest that the voluntary transfer is as to them fraudulent and void. Cooke on Life Ins., pp. 135, 136; 2 Big. on Frauds, pp. 76, 129; Elliott Appeal, 50 Pa. St. 75; Washington, etc., Bank v. Hume, 9 Sup. Ct. Rep. 41; Friedman v. Fennell, 10 So. Rep. 649; Catchings v. Manlove, 39 Miss. 655; Burton v. Fairholt, 86 N. C. 260. (5) A policy of life insurance, after its assignment, depends for its validity and continued existence upon the insurable interest which the assignee has in the insured life. It ceases at once to have any vigor because of the interest on which it was originally issued, and takes effect and continues in force by reason of the right of the assignee to insure the life. From the time of the assignment the policy becomes in legal effect a new policy and represents not the original interest, but the new interest. It may be that it is for this reason that the authorities pretty generally hold that the liability of the assignee of a life policy under the circumstances of this case is limited to the surrender value of the policy at the time of the transfer.

*Benj. Phillip* for respondent, Schuster-Hax National Bank.

VALLIANT, J.—The above five suits were begun in the circuit court of Buchanan county on December 18, 1895, in the order above named. The plaintiffs in all the suits are creditors of James W. Walker, deceased, and the object of the suits is to subject to the payment of plaintiff's debts the proceeds of three insurance policies on the life of James

W. Walker which were originally taken out by him for the benefit of himself, his executors, etc., or assigns, and afterwards assigned by him, two of them, to his wife and children, and the third surrendered and exchanged for a policy in favor of his wife. The defendants are the widow, one of the children, and the curator of the other children, of James W. Walker, deceased.

The plaintiffs in the last three suits filed intervening petitions in the first, setting up their respective claims as in their petitions stated, and praying a *pro rata* application of the funds in question to their debts. By consent of parties the five causes were consolidated, or tried together, and all disposed of in one decree.

The petition in the first case states substantially that in January, 1895, plaintiff obtained judgment for $5,118.36 against James W. Walker upon a promissory note made by him the 28th of July, 1893, at which date he was owner of a large amount of property, was interested actively in large mercantile enterprises, and reputed to be a man of great wealth, but was in fact then and continued thereafter to be insolvent. That in 1888 Walker took out two policies on his own life in the New York Life Insurance Company, one for $10,000 and the other for $15,000, payable at his death to his estate, both containing endowment features under which should he be living at a certain period, and the premiums had been paid, certain sums in cash for the surrender of the policies were to be paid to him or in lieu at his option paid up insurance would be issued to him. That about the same time he took out a policy in the Equitable Life Assurance Society for $10,000 with like provisions, and payable as the others. That on the —— day of ——, 1894, with knowledge that he was hopelessly insolvent, voluntarily and without consideration, and with intent to hinder, delay and defraud the plaintiff and his other creditors, he procured a transfer of the two New York Life Insurance policies, with consent

of the company, payable at his death to his wife, and chil-
dren; and at the same time and with the same intent, sur-
rendered to the Equitable the policy he held in that com-
pany and in exchange took from it a policy for same amount
and like terms, payable to his wife.    That afterwards, on
the —— day of August, 1895, Walker died insolvent, leav-
ing defendants, Mary V., his widow, Anna, his daughter, and
four other minor children, for whom defendant Woodson is
guardian and curator.    The defendants, Mary V., Anna, and
Woodson, curator, have collected from the New York Life
Company the amount due on those two policies, $27,625, and
Mary V., widow, has collected the $10,000 of the Equitable.
That Walker died intestate, and no administration has been
taken on his estate for the reason that he left no estate.
The prayer of the petition is that the transfer of the policies
be set aside and the proceeds applied to the payment of plain-
tiff's debt, until it is satisfied.    The petitions in the other
cases were similar in their statements and purpose, varying
in amounts as to the alleged indebtedness to the respective
plaintiffs.    The intervening petition stated also that the
amount of annual premiums paid on the three policies was
more than $2,000.    Defendants answered by general de-
nials.

Upon the trial the evidence showed that the two New
York Life policies for $15,000 and $10,000 respectively, as
above described, were issued to Walker in December, 1888,
and the Equitable policy for $10,000 January 8, 1891.
They were all payable to James W. Walker, his executors,
administrators or assigns.    The annual premiums of the
two New York Life policies were $562.50 and $375, and that
of the Equitable was $263.    On January 22, 1894, Walker
surrendered the Equitable policy to that company and took
in its place a policy identical with the one surrendered
except that it was payable to Mary V. Walker, if living, if
not, then to James W. Walker, his executors, administrators

or assigns.   On January 26, 1894, Walker with the consent
of the New York Life Company assigned the two policies in
that company to his wife, Mary V. Walker, and her chil-
dren.   At the time of the transfer of the two New York
Life policies and the surrender and reissue of the Equitable
policy, the annual premiums had been paid as they fell due,
and the policies were in full force; after the transfer and
reissue above mentioned; the premium $375 on the $10,000
New York Life policy, due December 3, 1894, and that on
the Equitable policy $263, due December 2, 1894, were paid,
presumably by Walker, but the premium on the $15,000
policy due at the same time seems not to have been paid
but in lieu thereof, in 1895, the policy in accordance with
one of its provisions, was extended as a paid up policy for the
full amount, to a definite date, November 3, 1908.   The
total amount paid for premiums on the three policies was
$7,312, of which $6,674 had been paid before the assign-
ment and reissue.   At the date of the assignment and re-
issue these policies had, each, a surrender cash value, viz.:
the $15,000 New York Life $1,092.20, the $10,000 New
York Life, $728.13, the Equitable, $204.85, total, $2,025.18.
The trial court found that at the date of the transfer of
these policies, January, 1894, Walker was indebted to the
plaintiffs in the several amounts stated in their petitions, and
that he was then insolvent, and we think the evidence sus-
tains the finding.   For although his credit at that time was
excellent, and the mercantile concerns with which he was
connected had all the appearances of successful business,
and doubtless but for the untoward conditions that befell
the internal commerce of the country at that period, would
have been in fact successful.   Yet in the face of those un-
favorable conditions, and tested by the actual emergencies
they were to encounter, the fact was their assets were in
the market worth much less than their liabilities, and

although they then paid their debts as they fell due yet they did so out of the treasuries of those who were willing to lend them money and not out of their own assets. The trial court found that the total paid by Walker for premiums in the three policies for the seven years in which they were maintained, was $7,874, and held that he had a right to expend for the purpose only $500 a year or $3,500 for the seven years, and deducting the latter from the former sum found that Walker in the seven years had paid out for the purposes of these policies $4,374 in excess of what the law allowed him to devote to insurance for the benefit of his wife, and decreed that that amount with interest at six per cent be paid by the defendants in the proportion of their respective receipts of the proceeds of the policies to the plaintiffs *pro rata* on their claims. Motions for new trial were filed and overruled and appeals were taken by the plaintiffs in the first two cases, and by the defendants in all the cases; the plaintiffs in the last three suits did not appeal. Upon the part of the appellant-plaintiffs it is contended: first, that the decree should have subjected all the proceeds of the policies to the payment of the complaining creditors; second, that the funds adjudged to be subject to creditors' claims be paid to the several plaintiffs in the order in which their respective suits were filed, paying each in full before going to the next in order.

On the part of defendants it is insisted that the plaintiffs are entitled to no part of the proceeds of the policies, but if to any part then only to the cash surrender value of the policies at the time, less $500, which the law allowed him to invest in life insurance for his wife's benefit. Defendant Woodson, curator, also insists that no decree can go against him affecting funds in his hands, belonging to his wards, since they are not parties to the suit.

I. The objection raised by defendant Woodson as curator of the minors' estates to the petitions, on the ground that

the minors were not made parties to the suits, should have been sustained.

A curator does not stand in the same relation to the estate of which he has charge as does an administrator. In case of an intestate's estate the title to the personal property vests in the administrator for the purposes of administration and he can sue and defend as such in his own name because of that title. But in the case of an infant's estate the title is in the infant alone and not in the curator. In such case the curator has only the custody, care and management of his ward's estate. [Section 5297, R. S. 1889; Duncan v. Crook, 49 Mo. 116.] It is the duty of the curator to represent his ward in all legal proceedings, to prosecute and defend for him, and is entitled to so represent him in any suit without being especially appointed as guardian *ad litem* unless in a particular statutory proceeding a different requirement should be made. [Section 5298, R. S. 1889.] But in all cases the ward is the party and the curator is the representative; the act either in suing or defending is the act of the ward by his curator. [Larned v. Renshaw, 37 Mo. 459; Robinson v. Hood, 67 Mo. 660.] In Catron v. Lafayette Co., 106 Mo. 659, it was held that a guardian could sue in his own name upon bonds assigned to him for his ward, but that was on the ground that the legal title to the bonds was in the guardian by the assignment, and that made him a trustee of an express trust and as such expressly authorized to sue in his own name under the provisions of section 3463, Revised Statutes 1879; sections 1991, Revised Statutes 1889, and 541, Revised Statutes 1899. It is contended by the plaintiffs that the minors really have no interest in the policies, and are therefore not proper parties, on the authority of Reed v. Painter, 129 Mo. 674. That decision is not applicable to these policies. The policy in question in that case was by its terms payable to the wife, or her legal representatives, and it was there contended that the

provisions of section 18, ch. 115, General Statutes 1865 (section 5854, Revised Statutes 1889), to the effect that insurance taken out for the benefit of a married woman, should inure to her separate use and benefit and that of her children, free from her husband and his creditors, etc., gave the children an interest in the policy with their mother during her lifetime. What the court says in that case is in reference to the interpretation of that statute, and the rights of the children derived under it. But here the children are not claiming under the statute, nor are they claiming an interest in a policy payable to their mother or her legal representatives; they claim under the terms of the assignment, whereby the policies were made payable to their mother and her children. They are purchasers with their mother under the assignment of the two New York Life policies, and are on equality with her.

Besides, these plaintiffs can not dispute with defendant Woodson that as between him and his wards the money is theirs, because they aver he has collected and holds the money as curator. Woodson must account in the probate court to his wards for this money, and the judgment in this case would not avail him in that accounting, because they are not parties to the judgment, and as to them it is *res inter alios acta.* The defendant Woodson is only the guardian of the fund; it does not belong to him, his possession is the possession of his ward and when the ward's title is assailed, the ward should be made a party to the suit.

II.   The vital question in the case, however, relates to the plaintiff's right to subject any and if any, how much, of the proceeds of the policies toward the payment of their debts.

There is no dispute of the general proposition that a voluntary conveyance by an insolvent debtor of his property to or for the benefit of his wife and children is deemed fraudulent as to his creditors, and void in law. And that

Judson v. Walker.

an assignment under such conditions of a life insurance policy would have a like effect is also undisputed. But these general propositions are often influenced by other considerations which render their application difficult. And there are such considerations entering into this case, so that we can not dismiss it with saying that because Walker was insolvent and made these assignments for the benefit of his wife and children, therefore the assignments are set aside and the proceeds of the policies devoted to the payment of his debts.

These policies in the beginning were payable to J. W. Walker, his executors, administrators or assigns. They were his property, and except as restricted by their own terms were as subject to his disposal as any other property owned by him. They did not belong to his creditors any more than did his carriages and horses; his creditors had no more right to complain of his free disposition of them than of any other of his property rights. Of course, as we have seen, he had no right while insolvent, to give away any property that the law held liable to execution in behalf of his creditors, but that is not saying that the title to his property vested in his creditors, or that he had no disposal of it. The fact is, though insolvent, he had the absolute right to dispose of it as he might see fit, subject only to the restrictions of the law in regard to the fraudulent dispositions to the injury of creditors.

The two New York Life policies were assigned by Walker to his wife and children and the Equitable policy was surrendered in exchange for a new one, identical with the first except that the sum due was payable to Walker's wife. There was no difference in principle between the assignment of the two and the surrender and reissue of the other; the effect was the same, the obligations of the insurance companies were the same after as before, except that the payees in the obligations were changed. At the time of

these assignments these policies had a certain cash value; Walker could have surrendered them to the companies and received that value in cash; if he had done so, and if he had then invested the cash in new insurance for his wife and children, the effect in law and the result in fact would have been the same as of the action he did take.

We are referred to cases in which it has been held that where a man has taken out a policy on his own life for the benefit of another, he can not afterwards without the consent of that other substitute another beneficiary in his place. But that feature is not in this case; Walker was himself the beneficiary in these policies and unless he violated the law in regard to disposing of his property in fraud of his creditors he and the insurance companies had the right to make any change in them that they might see fit.

A qualification of the general proposition that an insolvent debtor has no right to dispose of his property to his own use or that of his family, is that he may make such disposition as he pleases of such of his property as is exempt from execution. [Bank of Versailles v. Guthrey, 127 Mo. 189.] Statutes to relieve an insolvent debtor from the harsh demands of the common law have, as it were, grown upon our books by the very demands of nature, so that now not only are men not imprisoned for debt, but even a limited means of subsistence is left them, and experience shows that the world has not been made worse by it. These statutes are now pronounced by the courts praiseworthy and construed with liberality. Of this nature is the statute which authorizes a husband, even though insolvent, to devote a limited amount to providing by way of insurance on his life for the relief of his widow after his death. That statute is also to be construed liberally in furtherance of its benevolent purpose. Since its first introduction into our law it has so grown into favor that instead of being narrowed by construction, it has, in the light of experience, been developed both by

judicial construction and legislative requirement into greater efficiency in the attainment of its purpose.

This statute appears in General Statutes 1865, chapter 115, under the caption "Of Husband and Wife, and the Rights of Married Women," being section 15 of that chapter. It now appears amended as section 5851, Revised Statutes 1889, in the chapter entitled "Insurance." Its original design was to confer a right on married women which then it was supposed they did not have, that is, the right to have insurance taken for their benefit on the lives of their husbands. For this reason it was said by this court in Charter Oak Life Ins. Co. v. Brant, 47 Mo. 419, that it was an enabling act. The statute as it then stood was in these words: "Sect. 15. It shall be lawful for any married woman, by herself, and in her name, or in the name of any third person, with his assent as her trustee, to cause to be insured, for her sole use, the life of her husband, for any definite period, or for the term of his natural life; and in case of her surviving her husband, the sum or net amount of the insurance becoming due and payable by the terms of the insurance, shall be payable to her, and for her own use, free from the claims of the representatives of her husband, or of any of his creditors; but such exemptions shall not apply when the amount of premium annually paid shall exceed three hundred dollars." The form of expression used in that statute remind us of its early date. It was written not only when it was supposed the wife had no insurable interest in her husband's life, but also when all her personal property was his unless held by a trustee for her, or limited to her as her technical separate estate. Now it is contended by the plaintiffs that this statute has no application to this case, because under the assignment and reissue of these policies they are not *ex vi termini* for the wife's sole use, being simply payable to her without saying for her sole and separate use. But our married woman's law has grown since that statute was first written.

Since the Act of March 25, 1875, a wife's personal property is hers for her sole and separate use without the intervention of a trustee and without the technical words of limitation. The words in which this statute is expressed also indicate that it was then taken for granted that a married woman had no money of her own and that the premiums would have to be paid by her husband, hence it provided that the proceeds of the policy should be exempt from his debts. If a married woman at this day should with her own means take a policy on the life of her husband, she would not have to resort to this statute to claim it as exempt from his obligations. Such has been the growth of our law on this subject that that section has been taken out of the chapter on the rights of married women and given a place in its amended form in the chapter on Insurance. But its original purpose as defined in Charter Oak Life Ins. Co. v. Brant, *supra*, remains: "It enables a husband to effect a policy of insurance on his own life for the benefit of his wife, which, in case she survives him, goes to her free from his creditors and representatives." It is a statute of exemption, and is to be construed in the spirit of such statutes.

We are cited to some cases in other jurisdictions, where it is held that a voluntary assignment to the use of his wife by an insolvent, of a policy on his own life, payable to himself is void and the whole proceeds of the policy go to the administrator. Elliott's Appeal, 50 Pa. St. 75, is such a case. But that case was treated from the common law view, or rather under the statute of Elizabeth, it was uninfluenced by a statute like that of ours, which we are now considering. Besides, it was decided in 1865; the law on all the questions involved has developed to a considerable degree since then. The New Jersey case relied on, M. & M. Transp. Co. v. Borland, 53 N. J. Eq. 282 (31 Atl. Rep. 272) was upon a statute similar to ours as ours was in 1865. It was there held that the statute only gave the wife an insurable interest in her

husband's life, and authorized her to take out a limited amount of insurance, that is, limited in the premiums to be paid, but that she was to pay the premiums out of her own means, and that no authority was given the husband to devote any of his money to that purpose. To that extent the decision is in direct conflict with the interpretation put upon our statute in Charter Oak v. Brant, *supra*. But it quotes from the proviso in the New York statute which seems to have been the model for both the Missouri and the New Jersey statute, in which the words "out of the funds or property of the husband" occur, and intimates that if those words had been in the New Jersey statute the decision would be different. (Those words are now in our statute.) But even in that case the proportion of the proceeds of the policy liable to the husband's debts, is not decided. It is in fact only the opinion of the vice-chancellor upon a demurrer to the bill.

Those cases, taken as samples of decisions on which the plaintiffs rely, are thus referred to, to illustrate how little aid they give us in construing our own statute.

In Pullis v. Robison, 73 Mo. 201, this statute as it stood when the Charter Oak case above referred to, was decided, was again construed. In the Pullis-Robison case the husband had paid the premiums which amounted to more than $300 per annum; during a portion of the period in which the policies were running he was solvent and for another portion he was insolvent. The circuit court held that the wife was entitled to the proceeds of the policies, less the amount of premiums and interest on same, paid by the husband, while he was insolvent. But on appeal, this court held that the wife was entitled to so much of the insurance as was the product of the premiums paid by the husband while he was solvent and the creditors to so much as was the product of the premiums paid by him after he became insolvent; that is, that the plaintiffs should recover that proportional part

of the whole insurance money that the premiums paid by the husband, while insolvent, bore to the premiums paid by him while solvent. In the opinion which was by NORTON, J., reference is made to a New Jersey case, Landrum v. Knowles, 22 N. J. Eq. 594, in which a wife had taken out a policy on her husband's life for the benefit of her children and had herself paid the premiums for ten years. Then she and her husband assigned it to a creditor of his, and she ceased paying premiums, but they were paid thereafter until the husband's death by the creditor; the suit was between the creditor and the children, and it was held that they were entitled to the cash value of the policies at the time their mother ceased to pay the premiums, and the creditor to the balance. Reference is therein also made to a Pennsylvania case, Trough's Estate, 8 Phila. 215, where a man while solvent took out a policy on his own life and transferred it to a trustee for the benefit of his children and afterwards becoming insolvent continued to pay the premiums until his death, and it was held that the measure of the creditor's recovery was the amount of premiums paid after the debtor became insolvent. But this court did not approve either of those rules, and laid down the measure as above stated, and at the same time reaffirmed that the statute authorized an insolvent man to secure insurance on his life for his wife by withdrawing from his assets, premiums to the amount of $300 yearly.

The rule above laid down in Pullis v. Robison may be taken as the authoritative measure of the creditor's right of recovery under the statute as it stood when the rights in that case accrued. But in 1879, the statute as originally enacted had undergone the test of experience, and these questions having arisen the legislature, seemingly for the very purpose of putting them at rest, amended the act, by raising the amount permitted to be expended for this purpose by the insolvent husband, and specifying the measure of the cred-

itor's recovery in case the insurance was obtained at a greater cost out of the insolvent's estate. The *proviso* in the original act was in these words: "but such exemptions shall not apply when the amount of premiums annually paid shall exceed three hundred dollars." That is what was before the court in Pullis v. Robison. But by the amendment in 1879 the proviso reads: "but when the premiums paid in any year out of the funds or property of the husband shall exceed five hundred dollars, such exemption from such claims shall not apply to so much of said premiums so paid as shall be in excess of five hundred dollars, but such excess, with interest thereon, shall inure to the benefit of his creditors." [Section 5978, R. S. 1879.] So the law stood when the rights of the parties to these suits arose, and so it stands to day. In the face of this plain expression of the lawmaking power of the State, what is the use of our searching to see what courts in other States have said on the common law of the subject or on statutes different from ours? The amount that the creditors are entitled to recover in this case is the amount Mr. Walker paid for this insurance at the time it was effected for the benefit of his wife and children, plus premiums thereafter paid, minus $500 which he is authorized to pay, and legal interest on the same. What did he pay? The trial court treated all the premiums paid from the incipiency of the policies as the cost of the insurance, amounting for the seven years to $7,874, and deducted the amount the statute allowed to be expended, $500 a year, total $3,500 leaving $4,374, the amount with interest, for plaintiffs to recover. But the insurance obtained in January, 1894, for Mrs. Walker and her children did not cost $7,874. That was the sum of all the premiums that had been paid, and for so much of that sum as was paid before January, 1894, Walker, and through him his creditors, had received the benefit in the form of insurance carried, and to that extent the insurance companies had earned those premiums. But it was not all

exhausted in carrying the insurance because at the end of that period, in January, 1894, the policies had a cash value, which could be realized, and which was utilized in this new insurance effected by Walker for his wife and children. If instead of changing the beneficiaries in the policies he had surrendered them and taken their values in cash from the companies and had afterwards applied for new policies in the same companies on the same plans, they would have cost him more than it cost him in 1888 to take out the same policies; his increased age would have increased the cost even if nothing else intervened. But by planting the new insurance on the old, he preserved not only the premium rate, but also other advantages which the evidence shows would accrue after a number of years on policies of that kind and did accrue on these policies. Those advantages gave the policies their cash value over and above the mere risk that had been carried, and it is that value that Walker utilized in the insurance taken for his family, and that they must account for. The premium is not the only consideration that supports a contract of life insurance, but the insurable interest of the beneficiary is essential. A creditor has an insurable interest in the life of his debtor, upon which if he sees fit he may take out a policy which would be supported by that interest. A man has an insurable interest in his own life, and when he takes out a policy payable to himself or his administrator the policy rests for its validity on that insurable interest, and whatever indirect benefit his creditors have in that policy rests also on that foundation. But the wife also has an insurable interest in her husband's life and his creditors have no right to that interest nor to anything that is predicated upon it. Proceeds of life insurance therefore are not the product of premiums alone, but of premiums united with the beneficiary's insurable interest. After the transfer of the policies we are now considering, they rested no longer on the insurable interest of Walker in his own life, in which

his creditors were concerned, but depended for their validity upon the insurable interest of the wife and children in the life of their husband and father; without that interest the insurance, standing as it did in their name, would have been invalid; it would have been no insurance, and there would have been no proceeds. Therefore, whilst the creditors have some right to money that was used for premiums, and to the value of the old policies converted, they have no further right in the proceeds of the insurance.

Learned counsel say they "look in vain in the policies in evidence in this case for any provision that entitled the insured to surrender his policy and receive the cash value therefor." But their own proof showed that it was the fact, and it is as much a fact in the case as if it were so nominated in the bond, whether we call it a surrender value or a market value, the fact is there was a cash value which the holder could realize at his option.

The evidence shows that the cash value of the two New York Life policies on January 20, 1894, was $1,820.33, to which is to be added $263 premium paid on the $10,000 policy in December, 1894, making $2,083.33 less $500, leaving $1,583.33, which with interest at six per cent from January 20, 1894, is the amount of the recovery the defendants must suffer for these two policies, of which Mrs. Walker is to pay one-sixth and each of the children, after the four minors shall have been properly brought in, one-sixth.

The cash value of the Equitable policy on January 26, 1894, was $204.85, to which add $375 the premium paid December 20, 1894, and six per cent interest on each amount from the respective dates above named, and the sum will be what Mrs. Walker is to pay on account of that policy.

III. The remaining question relates to the distribution of the fund among the plaintiffs. The plaintiffs in the first two suits think the funds reached by this litigation ought to be applied to the payment of the claims in the order of the filing

of the suits, on the theory that diligence is meritorious and should be rewarded, whilst the plaintiffs in the last three suits think that the money should be distributed ratably under the maxim "equality is equity."

This is a suit in equity seeking to reach assets which an administrator could not reach through the ordinary channels of law. Assets of this kind are denominated equitable, they are reached only through a court of equity, and are to be distributed *pari passu* among all creditors. Such was the decision of this court in St. Louis v. O'Neil Lumber Co., 114 Mo. 74, where the subject was considered with care and the principle correctly stated.

The money recovered by defendants in this case is therefore to be distributed *pro rata* among all the plaintiffs in the five suits, in proportion to their respective claims, as found in the decree.

IV. The causes having been thoroughly tried and the facts seemingly all brought out, the circuit court would be directed to enter a decree in conformity to the views herein expressed if all the necessary parties were before the court; but the four minor children of James W. Walker are not parties, and a decree can not be entered against them, nor can they be brought in and subjected to judgment without an opportunity of being heard, their curator can not answer for them until they are in court by due process.

Therefore the judgment is reversed and the cause remanded to the circuit court with directions to permit the plaintiffs if they see fit to do so, to amend their petitions by making the four minor children of J. W. Walker, deceased, parties defendant, and when they are brought in by due process to retry the causes according to the views herein expressed, and if the plaintiffs by a day to be named by the circuit court do not so amend their petitions and take process against the minors mentioned, that court will enter judgment for defendants dismissing the plaintiffs' bills.

All concur, except *Robinson, J.*, absent.